**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| MICHAEL PARKS,<br>7372 Bent Grass Drive<br>Winter Haven, FL 33884 | ) | |
| *Plaintiff*, | ) | Case No. |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MARKWAYNE MULLIN,<br>Secretary of the Department<br>of Homeland Security, | ) | |
| *In His Official Capacity* | ) | |
| <u>Serve:</u><br>Department of Homeland Security<br>2707 MLK Jr. Ave SE<br>Washington, DC 20528 | ) | |
| Office of the United States Attorney<br>57 Pennsylvania Ave. NW<br>Washington, DC 20530 | ) | |
| Department of Justice<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530 | ) | |
| *Defendant*. | ) | |

## COMPLAINT FOR INJUNCTIVE AND COMPENSATORY RELIEF

Plaintiff, Michael Parks, by and through undersigned counsel, pursues this action on his own behalf. The Plaintiff hereby alleges as follows:

## INTRODUCTION

Plaintiff was a long-tenured African American Transportation Security Administration (hereinafter "TSA") employee. Plaintiff brings this action alleging that he has been the victim of an ongoing pattern, practice, and culture of race discrimination in denying qualified African American air marshals' promotional opportunities, particularly with respect to upper management positions. At TSA, promotional decisions of Federal Air Marshals are ultimately made by a small group of executive FAMS leaders at FAMS Headquarters, who are almost exclusively white men. As described herein, TSA functionally uses a quota system when it comes to promotion of African Americans.

At the highest levels, TSA has held a very small number of positions for African American K-band executives (usually two, and most three). When African Americans in those two or three positions, African American agents are selected to replace them. But when positions open up in the remaining K-band positions, African Americans are not considered, no matter how qualified they may be. Put another way, once the two or three African Americans are in place, promotional opportunities for African American agents are foreclosed. This practice serves as a de facto quota system. It forecloses promotional opportunities to highly qualified African Americans because of their race. Plaintiff was a victim of this quota system multiple times, and at least two times in June of 2022, which is what promoted him to file the EEOC charge that precipitated this case.

For the reasons outlined herein, Defendant has violated Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e, *et seq.*, in creating disparate terms and conditions of employment for African Americans FAMS employees, which in turn caused Plaintiff to be denied equal promotional opportunities as compared to white agents at FAMS because of his race. He seeks compensatory damages of not less than $300,000, as well as back pay, correction of his retirement

annuity, front pay, attorney's fees, litigation costs, pre-judgment interest, and all other remedies deemed appropriate by the Court.

## PARTIES

1. Plaintiff Michael Parks is an African American male, and resident of the state of Florida. As described in more detail below, Plaintiff began employment with FAMS in February of 2002, joining the Atlanta field office. He retired from FAMS in November of 2023.

2. Defendant Markwayne Mullin is the Secretary, U.S. Department of Homeland Security (hereinafter "DHS"), and is the agency head for the DHS, including its directorates, sub-agencies and divisions. Defendant has direct authority over and the final responsibility for the Federal Air Marshal Service. He is sued here in his official capacity.

3. Defendant is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of employees or agents of Defendant; in addition, Defendant is the employer of persons who have committed negligent, discriminatory acts and/or omission against Plaintiff within the course and scope of their employment. Therefore, Defendant is liable pursuant to the doctrine of *respondeat superior*.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to the federal antidiscrimination statute asserted herein. Further, this Court has jurisdiction over this Complaint because there is diversity of the parties and presents a question of federal law. 28 U.S.C. §§ 1331 (federal question) and 1332 (diversity).

5. Venue properly lies within this Court pursuant to 28 U.S.C. § 1391, 42 U.S.C. § 2000e- 5(f)(3). Secretary Mullin, as Secretary for the U.S. Department of Homeland Security, is headquartered within the District of Columbia, however the headquarters of the Transportation

Security Administration, which contains the FAMS, is located in Virginia. The jurisdiction of the headquarters of the agency is a proper venue for all Title VII claims. As alleged herein, promotion decisions are ultimately made by a small group of executive FAMS leaders at FAMS Headquarters in Virginia.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiff has filed EEO complaints alleging race discrimination for Defendant's failure to grant him a promotion. For reasons stated herein, he has fully exhausted his EEO complaint and his claims are timely due to the filing of the original complaint in this action filed November 29, 2023.

7. On July 20, 2022, Plaintiff contacted an EEO counselor about being denied three promotions in June of 2022, alleging individual race and color discrimination for engaging in prior EEO activity.

8. On August 3, 2022, in his initial interview with an EEO counselor, Plaintiff filed a class claim.

9. On December 13, 2022, Plaintiff filed a Formal EEO Class Complaint. By this time, the AJ was already considering separate, much less detailed and descriptive, class claims on behalf of Mr. Sutton, Ms. Stephens, and Mr. Jordan, and did not consider Plaintiff's Formal EEO Class Complaint in rendering his decision on the other pending class claims.

10. Plaintiff's class complaint bore no resemblance to the class claims of Mr. Sutton, Stephens or Jordan. Rather than the three sentences asking for counseling of class claims, Plaintiff's class claim was much more robust, and included a detailed eight page-long break-down of TSA policies and practices and how those policies and practices discriminated against African American FAMS employees on a class wide basis.

11. On or about December 16, 2022, Plaintiff received the letter of receipt of his claim.

12. On or about December 20, 2022, Plaintiff received a letter notifying him that his individual claims were held in abeyance.

13. The letter to Plaintiff indicated that his individual claims would be held in abeyance but said nothing about the treatment of his class claim.

14. Plaintiff class claims were not referred to the EEOC Commission and were not assigned to an AJ in accordance with 29 CFR § 1614.204.

15. TSA did not move the AJ to consolidate Plaintiff class claims into the matter pending before him.

16. There was no motion to reopen the briefing to include Plaintiff claims, or any other mechanism to have Plaintiff class claims considered by the AJ.

17. Approximately one month after the AJ ruled on Mr. Sutton's class allegations, on or about July 23, 2023, Plaintiff received notice of the acceptance of his EEOC charge, in correspondence from Mr. Cleary.

18. In response, Plaintiffs' counsel specifically informed Mr. Cleary that Mr. Parks' Formal EEO Class Complaint had not been addressed, and that he was asserting those claims on behalf of himself and those similarly situated.

19. On or about July 26, 2023, Mr. Clearly indicated that he would not accept the class claim. Plaintiffs' counsel made clear that Mr. Parks was continuing to assert class claims regardless of what the EEO counselor was willing to accept.

20. Importantly, Mr. Cleary never issued a final agency decision rejecting and/or dismissing Plaintiff's class claims, thus those claims remained open and pending until Plaintiff filed the instant lawsuit.

21. Also, when Mr. Sutton and Mr. Jordan received notice that their individual claims were released from being held in abeyance, Defendant took no action on their class claims.

22. To this day, Plaintiff has not received a final agency decision on his class claims.

23. Because Plaintiff filed his initial complaint more than 180 days from the date he filed his Formal EEO Class Complaint, his class claims of race discrimination are timely.

24. Plaintiff's individual claims of discrimination in being denied for three promotions in June of 2022 has been fully exhausted.

## DISMISSAL OF PLAINTIFF'S CLASS CLAIMS

25. This case was originally filed in the District Court of the District of Columbia.

26. On or about March 27, 2026, it was transferred to the Eastern District of Virginia.

27. Defendant moved to dismiss the claims herein and on the ORDER of Judge Leonie Brinkema, dated May 29,2026, Plaintiff's class claims were dismissed.

28. Judge Brinkema gave Plaintiff leave to refile his individual claims, and they are asserted herein.

29. Plaintiff also asserts his class claim to the extent required to preserve the matter for appeal.

30. Plaintiff asked Judge Brinkema for leave to appeal her decision on his class claim, which Judge Brinkema denied from the bench.

31. Plaintiff maintains that Judge Brinkema's decision on the viability of his class claim is erroneous as a matter of law. But inasmuch as such is not a final appealable decision at this time, Plaintiff asserts only that he intends to appeal that decision.

## RELEVANT BACKGROUND FACTS

### A. THE FEDERAL AIR MARSHAL SERVICE

32. In response to a number of brazen and deadly airplane hijackings in the early 1960s, the U.S. government formed the Federal Air Marshal Service ("FAMS") in 1961.

33. The program deployed a small number of law enforcement officers to protect flights deemed to be at high risk of hijacking.

34. After the terrorist attacks of 9/11, President George W. Bush ordered a dramatic expansion of the FAMS as part of the government's counter-terrorism efforts.

35. While only 33 air marshals worked on U.S. flights at the time of the attacks, today the Department of Homeland Security's TSA employs thousands of air marshals charged with keeping flight crews and passengers safe while aboard civil aircraft.

36. These highly trained law enforcement officers play a vital role in the TSA's comprehensive approach to addressing evolving threats in civil aviation. These threats can include terrorist activities carried out by lone wolves and nonstate actors, human trafficking and narcotics smuggling, among others.

37. A unique entity within the world of law enforcement, FAMS trains its members to work undercover, blending in with passengers aboard commercial aircraft. Air marshals scan for potential threats using investigative techniques and their knowledge of criminal and terrorist behavior.

38. To avoid tipping off terrorists and other bad actors, air marshals maintain anonymity and use cover stories while traveling back and forth between international and U.S. cities and ports.

39. Air marshals may also conduct investigative work on the ground to prevent terrorism. This often involves working alongside FBI Joint Terrorism Task Forces and other law enforcement agencies.

40. Common federal air marshal duties include:

- Executing arrest warrants
- Assessing flight environments and passenger behavior
- Responding to emergencies and criminal activities occurring during flights
- Serving as witnesses in court
- Using close-quarters self-defense techniques and firearms to protect themselves and other passengers
- Investigating suspicious activities related to aviation
- Arresting passengers who commit crimes aboard flights

41. Unlike many other federal agencies, TSA and FAMS are considered "Excepted Services" and are not subject to the OPM [Office of Personnel Management] standards set out in Title 5 of the U.S. Code, for competitive services or Senior Executive Services. This means that the well-known federal employee promotional processes are not applicable to TSA and FAMS, and these agencies essentially implement their own promotional processes.

**B. CURRENT MANAGEMENT STRUCTURE OF THE TSA AND FAMS**

42. Defendant Markwayne Mullin is the current Secretary of Homeland Security. Secretary Mullin was appointed by President Donald Trump and sworn in on March 24, 2026.

43. Prior to serving in his current role, Defendant served as a United States Senator from the state of Oklahoma.

44. The Administrator of the TSA reports directly to the Secretary of the DHS. Currently, the TSA Administrator is David Pekoske (hereinafter "Administrator Pekoske"). Administrator Pekoske was appointed in August of 2017 by Donald Trump.

45. From approximately August 11, 2019, to November 13, 2019, and again from January 20, 2021, to February 2, 2021, Administrator Pekoske served in a dual role as TSA Administrator and acting Secretary of the DHS.

46. Administrator Pekoske has long been known to be involved in the promotion selection process alleged here that is based on his friendships, sexism, discrimination and favoritism, resulting in a process that overwhelmingly selects white males for promotion to the detriment of higher qualified African American FAMS agents.

47. The TSA Administrator is supported by a Deputy Administrator and several Deputy Assistant Administrators who run various aspects of the agency's operations. The Executive Assistant Administrator for Law Enforcement is also the Executive Director of FAMS, and the terms "Director" and "Executive Assistant Administrator" are used interchangeably.

48. Between October 2018 and 2020, the Executive Assistant to the Administrator (EAA) was David Kohl (hereinafter "Mr. Kohl"). Mr. Kohl was once a Capitol police officer in Washington D.C. and was promoted to EAA for FAMS in 2018 by Administrator Pekoske. Mr. Kohl was promoted while being actively investigated for discrimination at FAMS' Chicago field office.

49. Until August of 2023, the Executive Director of FAMS was Michael Ondocin (hereinafter "Mr. Ondocin"). Mr. Ondocin, who was once a police officer with the NYPD, was promoted to Executive Assistant Administrator for FAMS in 2018, after having served as the Supervisory Air Marshal in Charge (SAC) of the Boston field office.

50. On or about August 14, 2023, Brian Belcher was elevated to acting Executive Assistant Administrator for Law Enforcement, and is now FAMS' Executive Assistant Administrator/Director for the Law Enforcement.

51. AMS uses the following rank nomenclature, introduced in 2011:

- Director/Executive Assistant Administrator
- Deputy Director
- Assistant Director/Deputy Executive Assistant Administrator
- Deputy Assistant Director
- Supervisory Air Marshal in Charge (SAC)
- Deputy Supervisory Air Marshal in Charge (DSAC)
- Assistant Supervisory Air Marshal in Charge (ASAC)
- Supervisory Federal Air Marshal (SFAM)
- Senior Federal Air Marshal
- Federal Air Marshal (FAM)

52. FAMS has field offices located in or near the following cities: Atlanta, Baltimore, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Houston, Las Vegas, Los Angeles, Miami, Minneapolis, Newark, New York, Orlando, Philadelphia, San Francisco, Seattle and Washington, D.C.

53. FAMS has a training facility in Atlantic City, New Jersey, where there are also multiple SACs.

54. Positions at FAMS are referred to as being in "bands" for pay and supervisory authority.

55. Bands are given a letter in the alphabet, and the higher the job and responsibility, the higher the band. The highest band is the "K" Band. The lowest band is the "G" Band.

56. "K" Band jobs are considered senior management that oversee "J" Band, or supervisory positions.

57. Importantly, there is a different selection process for jobs at lower levels than for senior management positions.

58. At the G through I Bands, promotions are based on time in rank, with promotions typically occurring after one year at a pay grade.

59. Once an agent reaches the J Band, promotions are ostensibly based on interviews and the recommendation of the SAC under which the applicant works. However, at that level and above, promotional decisions are almost entirely subjective and are ultimately selected by a small group of executive level FAMS and/or TSA leaders in the agency's Headquarters.

60. The TSA Transportation Security Executive Service (TSES) consists of TSA's executive-level staff who serve in key agency positions just below political appointees, including Supervisory Air Marshal in Charge (SAC) positions and FAMS Deputy Executive Assistant/Director and Executive Assistant/Director positions.

61. Sometime in 2010 or 2011, TSA and FAMS created the TSES designation for TSA employees, allowing TSA to fashion its own rules for promotion to executive-level staff. Qualifications to be promoted to this new TSES designation were "developed by TSA leadership. . . for the purpose of bypassing the OPM [Office of Personnel Management] SES certification process and congressional budget approval."

62. Unlike those who obtain SES certification, those who are promoted to TSES level positions cannot take their classification and work as SES executives in other federal governmental agencies. All SES level positions within TSA are designated as TSES positions.

63. If an agent wants to be promoted to a K Band or TSES position, he or she must apply to an open posting.

64. In 2019, TSA established an Executive Resources Counsel (ERC). All applications are submitted through the USAJOBS website, and a computer program reviews them and disqualifies those that fail to meet certain minimum requirements. For K Band positions, applicant responses and resumes are reviewed by TSA Human Capital Recruitment and Hiring to determine who is best qualified.

65. The Selecting Official (who is typically the SAC whose office has the vacancy) receives a list of candidates and may interview some, none, or all of these candidates. If the Selecting Official decides to interview some or all of the candidates, a panel is formed including the SAC, and the SAC consults their Regional Director or Executive Director and other panel members to determine who gets an interview.

66. The interviews themselves are to be conducted through a "structured interview toolkit," including identified questions, and each interviewer is to score each candidate. The results of the interviews and ranking of the candidates is forwarded to a FAMS' Assistant Administrator for final review.

67. The Assistant Administrator makes a recommendation and Senior Executive Management will either select that recommended candidate, or select another candidate.

68. In reality, however, promotion decisions do not follow this procedure. Instead, the list of the successful USAJOBS applicants is forwarded to FAMS' Headquarters. The Assistant Directors and Deputy Assistant Directors in FAMS Headquarters pares the list to six candidates.

69. This list of six candidates is then sent to the Selecting Official (again, usually the SAC whose office has the vacancy), who, based on his or her judgment, decides whether any of the candidates should be interviewed. Often, the Selecting Official conducts no interviews or, on an ad hoc basis, calls the SAC supervising a candidate to obtain background and recommendations.

70. The Selecting Official then sends his or her top three candidates back to FAMS Headquarters. At Headquarters, the Assistant Directors and Deputy Assistant Directors ultimately make the decision on who will be promoted. These individuals may select from the list of three candidates provided by the Selecting Official, or choose any other candidate.

71. There is no guideline, standard, or rule that constrains the Assistant Directors and Deputy Assistant Directors in determining who they want to be on the top six list for promotion.

72. In practice, there is no standard or consistency as to what applicants are asked in the interviews, or how they are evaluated based on their answers. The process is completely opaque, but very consistent in weeding out African American applicants.

73. The first level at which African Americans applicants are weeded out of promotional opportunities is in the creation of the top six most eligible list by those at FAMS Headquarters.

74. On the rare occasions that African Americans make it onto the most qualified list for a position, they are almost always overlooked for a preferred white candidate.

75. For specified K-Band SAC and the new TSES positions (created by TSA) vacant within FAMS, TSA policy, through the ERC, provides that TSA Human Capital Recruitment and Hiring will supply TSES Ranking Panel Instructions to three identified panelist members.

76. One of the panelist members is selected as the 'Lead.' If the position warrants it, panelist members review and score Professional Technical Questions (PTQs) completed by applicants.

77. Panelist members may be from FAMS and/or TSA. Panelist members may rank the applicants individually but must come to a minimum consensus before the rating process is completed.

78. The panel's ratings are submitted back to Human Capital. Although the ERC may be required to approve the candidate for the K-Band and/or TSES position, the selection is completed by a process that includes FAMS K-Band level or TSES employees and ultimate approval of the selection to be submitted to the ERC is made by FAMS. ERC then convenes to

'Approve' the selections from the various components of TSA including those submitted by FAMS to fill the specified K-Band SAC and TSES positions.

79. The members of ERC should come to a decision on the submitted selection as approved or disapproved. The Chair reserves the right to render the final decision in the event a decision cannot be reached.

80. If the ERC does not approve a recommendation, then the Assistant Administrator, Deputy Assistant Administrator, and/or Director of the requesting office is afforded an opportunity to attend the following ERC meeting to receive an explanation as to why the selection was not approved.

81. However, in practice, this new TSES designation became fertile ground "to promote additional white male FAMS agents over more qualified African American and female agents."

82. For example, TSA does not require FAMS agents seeking promotion to TSES positions to complete the SES certification process; instead, an applicant merely may highlight certain competencies (called Executive Core Qualifications, or ECQs) on his or her resume.

83. Like promotion to K Band discussed above, applicants apply through USAJOBS, but receive an email from FAMS Headquarters to learn whether they have been selected to make it to the next round.

84. This decision, like K Band promotions, is made by a select, small group of administrators and is opaque to applicants. If the position is for a field SAC position, for example, those in the FAMS Headquarters will select those who move on to interviews; if the applicant is applying for a FAMS deputy director or director position, those in TSA Headquarters will decide who will be interviewed.

85. Following the interviews, the FAMS assistant administrator will ultimately make the promotion selection. The TSES promotion process, one that is idiosyncratic to TSA, allowed FAMS "leadership to promote additional white male FAMS agents over more qualified African American and female FAMS agents"

86. In sum, Defendant's promotion policy and practices for K Band and TSES positions vary on the exact methodology, but all contain the same material components that are excessively subjective, lack objective job-related criteria, and are ultimately made by a small group of the same people – executives who make up an "old boys' network" brought to TSA from the Secret Service, from which many of TSA's original leaders were employed.

87. Defendant's promotion policy and practices have resulted in a disparate effect on African American and female FAMS agents. For example, out of the total of 200 J Band positions, just 11 African Americans currently hold J Band positions.

88. Out of the 14 Black females who made it to the J Band level, since the inception of the agency, only 6 were ever selected for a K Band position, two of which were promoted only after the original complaint in this action was filed.

89. Currently, there are approximately 66 K Band law enforcement jobs at FAMS. Of those 66 positions, just 10 are held by African Americans and just 12 are held by females (and 4 of these females are African American, resulting in just 18 of the 66 K Band positions currently held by Black or female agents).

90. Approximately 46 FAMS agents have been promoted to TSES positions since the inception of that designation. Of those 46 TSES agents, none have been female African Americans. Just 8 Black male agents and just 7 female agents (nearly all of whom are white) have been promoted to TSES positions.

91. As of 2022, 18 of the 20 FAMS field offices were led by men, and 15 of the 19 occupied FAMS field office SAC positions were filled by white male agents.

92. Defendant has set up a selection process and has fostered practices that essentially allow for only two or three African Americans to ever have K band positions.

93. Once those positions are filled, all other K band positions are only available to white agents.

94. Black agents are only considered to backfill the openings created when Black K band officials retire.

95. Defendant operates essentially a quota system that forecloses opportunities for highly qualified Black agents once the quota has been filled.

**C. FAMS REPEATEDLY DENIED PLAINTIFF PROMOTIONS DUE TO ITS DISCRIMINATORY POLICIES AND PRACTICES.**

96. Plaintiff was a Supervisory Federal Air Marshal (SFAM) who was hired by FAMS in February of 2002, to join the Atlanta field office.

97. Plaintiff transferred to FAMS Headquarters in 2005 and served there until 2009.

98. During that time, he applied to no less than 50 K Band positions nationwide.

99. In 2009, Plaintiff was informed by his SAC that senior leadership wanted to promote him to SFAM for a newly created K-9 Supervisory position with specific specialized Knowledge, Skills and Abilities (KSAs) – a list of special qualifications and personal attributes for a particular position to describe in applying for the position.

100. Plaintiff applied and was informed by his SAC that he was selected for the promotion to be announced in the next 3 days.

101. When the promotion list was posted agency wide, however, it was given to a white male who did not have any of the specialized K-9 experience (KSA) that was advertised.

102. Plaintiff was later informed by his SAC that senior leaders owed a favor to the white male who was selected, and that they would try to promote Plaintiff at a later date.

103. The selected white male FAM, Matt McChessney, directly called Plaintiff and apologized for taking the position from him, and stated he answered the specialized KSAs by writing, “I have no K-9 experience but I’m willing to learn if selected.”

104. In 2009, Plaintiff was contacted by another senior official in his chain of command apologizing for how he was treated and directly instructing Plaintiff to apply to the Chicago office for promotion.

105. Plaintiff was persuaded to apply for the Chicago job because he was told that he was one of the most qualified persons to ever apply for the Chicago SFAM position.

106. Plaintiff immediately applied for the Chicago office SFAM position. Again, he was informed by his SAC 3 days prior to the announcement being posted that he was selected for the promotion.

107. When the promotion list was posted agency-wide 3 days later, the position was given to a white official.

108. A few months later, Plaintiff decided to transfer back to the Atlanta Field Office because of how he was being discriminated against and passed over on multiple occasions by white officials.

109. In Sept 2011, Plaintiff was finally selected for promotion from I Band to J Band due to the consistent advocacy of his African American SAC.

110. In 2014, Plaintiff applied for another promotion for a specific, specialized K-9 Manager position at the TSA K-9 training ASAC in San Antonio, Texas.

111. He was contacted by his manager and informed he was selected for the promotion due to his extensive and specialized K-9 experience.

112. When his ASAC, Brian Persaud, was informed that Plaintiff was selected for another promotion, he became upset because Plaintiff did not consult with him before applying for the position and he stated he felt blindsided by Headquarters when they informed him of Plaintiff's promotion.

113. Plaintiff's ASAC, Brian Persaud, stated he purposely called Headquarters to inform them that he did not concur with Plaintiff's promotion. The promotion was given to a white male with three years less experience in the agency than Plaintiff, and 10 years less experience overall.

114. Between 2014 and the present, Plaintiff applied for over 40 more promotions and was not selected.

**D. FMS DENIED PLAINTIFF PROMOTIONS DUE TO HIS RACE WITHIN THE STATUTORY PERIOD.**

115. On or around June 8, 2022, Plaintiff was denied a promotion to the position of the Assistant Supervisory Air Marshal in Charge (ASAC) in Newark, New Jersey, in favor of a white applicant, Dan Brown, who had held half as many HQ and J-Band positions as Plaintiff.

116. At the time he applied for this position in June of 2022, Plaintiff had a positive job performance rating, and was meeting all expectations.

117. Plaintiff was placed on the list of most qualified applicants for the job, and was interviewed.

118. Plaintiff was the most qualified person who was eligible for the position.

119. Newark had never employed a Black ASAC.

120. At least ten African American agents have applied to be ASAC in New Jersey, between 2015 and 2022.

121. At least five were placed on most qualified lists. None were selected.

122. As described herein, FAMS does not and will not promote Black agents into positions held by white ASACs.

123. Plaintiff asserts that the pattern described herein, of blocking African Americans from being promoted into positions that are not already held by African Americans is the causal and principal reason why he was denied the promotion to ASAC in New Jersey.

124. On or around June 8, 2022, Plaintiff was denied a promotion to the position of the ASAC in Chicago, Illinois, in favor of a white candidate, Warren Haines.

125. Plaintiff was hired 6-8 years before the selected candidate, held approximately twice as many HQ positions and J-Band supervisory positions, and had significantly greater operational experience.

126. The ASAC position to which Plaintiff was applying was previously occupied by a white person, and because of his race, Plaintiff was not eligible for the role.

127. Management asserted that the chosen applicant was more highly recommended by his superiors than Plaintiff, leading to his assignment.

128. Plaintiff alleges that this was categorically untrue, as Plaintiff received the highest possible recommendation for the position from his supervisor, .

129. Plaintiff also had longer tenure and more directly applicable experience.

130. On or around June 11, 2022, Plaintiff was denied a promotion to the position of ASAC in Orlando, Florida. Once again, Plaintiff was more qualified than the chosen applicant, with a more substantial history of leadership positions and operational experience.

131. Again, Plaintiff was the most qualified applicant, with the longest tenure and most directly relevant experience.

132. Because of the pattern of only allowing African American applicants to fill positions that have been held by African Americans, Plaintiff was denied this promotion.

133. Plaintiff was later informed that he was no longer being seriously considered for promotion because of his complaints to management about the lack of promotional opportunities for African American agents.

134. Defendant's actions have caused and continue to cause Plaintiff financial losses in an amount to be determined according to proof, including but not limited to lost wages and retirement earnings, out-of-pocket costs, and other lost employment benefits and opportunities.

135. Plaintiff has suffered emotional distress, humiliation and embarrassment, in a value to be determined according to proof. Such emotional distress has been manifested in a variety of ways including, but not limited to, psychological trauma and physical symptoms to be proven at trial.

## CLAIMS FOR RELIEF

## COUNT I

### Race Discrimination, Failure to Promote under 42 U.S.C. § 2000e, et seq. (Disparate Treatment)

136. Plaintiff references and incorporate all of the allegations in the previous paragraphs as if fully restated herein.

137. Plaintiff is a member of a protected class, African American.

138. Defendant's conduct constitutes disparate treatment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

139. As described herein, Defendant has maintained a pattern and practice of race discrimination with respect to competitive promotions to K Band and TSES positions. Race

discrimination has become the standard operating procedure of Defendant with respect to promotions to senior level positions.

140. Plaintiff has been injured by the disparate treatment discrimination that he has encountered.

141. On behalf of himself, Plaintiff requests relief as provided in the Prayer for Relief below.

## PRESERVED CLASS CLAIM

142. Plaintiff asserted and exhausted a class claim alleging systematic race discrimination on behalf of himself and those similarly situated.

143. Another Plaintiff, Chad Sutton (hereinafter "Mr. Sutton"), had also asserted a similar class claim and Mr. Sutton's class claim was denied by and ALJ.

144. Plaintiff's class claim was never included in, consolidated with or ever addressed by the ALJ.

145. When the agency issued its final decision document, which triggered the 90-day clock for Mr. Sutton to file his class claim in court, it did not include Plaintiff in the notice or provide any other notice to Plaintiff that his time to file a class claim in court had begun.

146. Importantly, at the time that Mr. Sutton's class claim was fully exhausted and ripe for court, Plaintiff's individual claim was not yet ripe.

147. Plaintiff could not have served as a class representative in a court action because his individual claim was could not stand until it was exhausted.

148. Plaintiff was denied procedural due process of his class claim, and maintains that his class claim was improperly dismissed by Judge Brinkema.

149. Judge Brinkema dismissed the class claim with prejudice and denied leave to reassert it, but also denied leave to interlocutory appeal that decision.

150. Plaintiff reasserts, and preserves his class-based claim herein for the purpose of appeal.

## PRAYER FOR RELIEF

Therefore, Plaintiff prays that the following relief be granted:

(a) Enter a declaratory judgment that Defendant's conduct as alleged herein has violated Plaintiff's civil rights and the civil rights of FAMS' African American agents under 42 U.S.C. § 2000e;

(b) Award compensatory damages according to proof for Plaintiff as would fully compensate for his emotional distress, embarrassment, humiliation, deprivation of his right to equal employment opportunity regardless of race and other harms alleged herein;

(c) Award all financial damages that Plaintiff has sustained as a result of Defendant's conduct, including but not limited to back pay, front pay, retirement payments, out-of-pocket expenses and general and specific damages for lost compensation and job benefits that he would have received but for the discriminatory practices of Defendant;

(d) Award reasonable attorneys' fees incurred in this action and the administrative claims that preceded it, expert fees, and costs;

(e) Award pre-judgment and post-judgment interest, as provided by law; and

(f) Order other such relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff Michael Parks demands trial by jury on all claims so triable.

Dated: September 10, 2026

Respectfully submitted,

/s/*Katherine L. Herrmann*
Katherine L. Herrmann (VA Bar No. 83203
The Erlich Law Office, PLLC
1550 Wilson Blvd.
Suite 700
Arlington, VA 22209
Tel: (703) 791-9087
Fax: (703) 351-9292
Email: kherrmann@erlichlawoffice.com

*Attorney for Plaintiff*